STATE, ROBERT GIVIN ET AL., PROSECUTORS, v. HENRY WRIGHT, COLLECTOR OF TAXES IN THE TOWNSHIP OF SHAMONG, IN THE COUNTY OF BURLINGTON.

1. In 1758 the colonial government of New Jersey purchased lands for the Indians residing within its borders, with a stipulation that the said lands should not be subject to taxation. The lands were after- wards sold in 1801, at the request of the Indians, from whom the prose- cutors claim to derive their title. After the conveyance of the Indian title, the lands were taxed in the hands of their grantees. The state courts affirmed the assessments, but on appeal to the Supreme Court of the United States, a decision was rendered in 1812, denying the right of the state to impose the tax.

2. In 1814 these lands were again assessed, and from that date until the year 1877 taxes upon them have been annually assessed and paid by the prosecutors or their grantors without objection. *Held*—

State, Givin, pros., v. Wright.

1. That the act of the legislature granting the exemption to the Indians must be regarded merely as authority for and evidence of the contract entered into by the supreme power.

2. That this contract is subject to be abrogated, rescinded or its benefits lost to the party seeking to enforce it, according to the rules which apply in other cases.

3. That the fact that, after the tax was declared to be illegal, it was again levied in 1814, and that the prosecutors or their grantors, with full knowledge of their rights, paid the imposition, and have uninterruptedly continued to pay it annually since that time, without questioning the right to lay it, raises a conclusive presumption that by some convention with the state the right to exemption was surrendered.

On *certiorari*. In matter of taxation. The facts fully appear in the opinion of the court.

Argued at June Term, 1879, before Justices DEPUE, VAN SYCKEL and DIXON.

For the plaintiffs, *Fred. Voorhees* and *P. L. Voorhees.*

For the defendants, *Chas. E. Hendrickson* and *J. P. Stockton, Attorney-General.*

The opinion of the court was delivered by

VAN SYCKEL, J. This controversy involves the right to levy taxes for township, county and state purposes upon more than three thousand acres of land in the township of Shamong, in the county of Burlington, comprising one-twelfth of the area and one-fifth of the value of all the lands assessed in the township.

Prior to 1758, the remnant of the tribe of Delaware Indians had claims to a large portion of lands in this state, which the government and proprietors under the conveyance from King Charles II. to the Duke of York desired to extinguish. To effect that object, a convention was held in February, 1758, between the Indians and the commissioners appointed by the then existing government of New Jersey, the result of which was, that the government purchased the tract

of land now the subject of litigation, on which the Indians might reside, in consideration of which they released their claim to all other lands in New Jersey south of the river Raritan.

The act authorizing this adjustment, passed August 12th, 1758, will be found in 2 *Nevill's L.*, *p.* 212.

The eighth section of that act, which gives rise to the present contention, is in these words:

. " Be it enacted, That the lands to be purchased for the Indians, as aforesaid, shall not hereafter be subject to any tax; any law, usage or custom to the contrary thereof, in any wise, notwithstanding."

The legislative act further provided that it should not be in the power of the said Indians, or their successors, or any of them, to lease or sell to any person or persons, any part of said lands.

In conformity with this arrangement, the tract of land in question was, on the 29th day of August, 1758, conveyed by Benjamin Springer to Francis Bernard, governor of the colony of New Jersey, and the commissioners appointed by the act of assembly, in trust for the Indians, commonly called the " Brotherton."

Under an act passed March 17th, 1796, (*Paterson's L.*, *p.* 200,) commissioners were appointed to take charge of these lands and to lease them for the benefit of the Indians. This act remained in force until 1801, when the Indians, being desirous to remove to Stockbridge, in the State of New York, petitioned the legislature that their lands might be sold, and the proceeds paid to them.

An act of the legislature authorizing such sale was passed December 2d, 1801, (*Pamph. L.*, *p.* 131,) under which conveyances were subsequently made. See *Minutes of Assembly*, 1801, *p.* 481.

. The prosecutors claim to derive their title from the Indians under this legislation, and insist that immunity from taxation inheres in the title in their hands.

The act of 1801 contains no expression respecting the

privilege of exemption from taxation annexed to those lands by the act under which they were purchased for the Indians.

After the conveyance of the Indian title, under the act of 1801, these lands were first assessed for taxes in the year 1803. The legality of this imposition was promptly challenged, and the Supreme Court, in State *v.* Salter, (not reported) at September Term, 1804, adjudged it to be unlawful.

This decision led to the passage of an act of the legislature in October, 1804, repealing the clause exempting these lands from taxation. (*Pamph. L.*, 1804, *pp.* 418–423.)

In 1805 the lands were again assessed, and the right on the part of the state to subject them to taxation was maintained by the Supreme Court in State *v.* Wilson, decided at November Term, 1807. (*Penn.* 300.)

This judgment was affirmed in the Court of Errors, and was afterwards carried to the Supreme Court of the United States, where, in the opinion delivered by Chief Justice Marshall in 1812, (*State of N. J.* v. *Wilson,* 7 *Cranch* 164,) the repealing act was declared to be unconstitutional, and the right of the state to impose the tax denied.

These lands were again assessed in the year 1814, and from that date, until these suits were instituted in 1877, taxes upon them have been annually assessed and paid for township, county and state purposes, without objection or protest.

We cannot now consider the questions whether the legislature could deprive itself of the power of taxation, which was essential to the existence of the government it was created to preserve and perpetuate, or whether the right to exemption under the peculiar circumstances of this case passed to the grantees of the Indians.

It will not be improper, however, to observe that the case in 7 *Cranch* was submitted to the court upon a statement of facts without argument, and that a complete history of the case was not before it. The act of March 17th, 1796, (*Paterson's L.*, *p.* 200,) has, through the research of the attorney-general, been presented for consideration for the first time on the argument of this cause. The determination in the

higher court would be more satisfactory if it contained an answer to the forcible views of Justice Rossell in our Supreme Court.

Why, within two years after this successful appeal to the highest judicial tribunal of the country, the owners of these lands submitted to taxation, has been the subject of much speculation, and as an historical fact is unaccounted for by the thorough research which has been given to the subject.

The only answer which this court can give to the question is to declare the presumption of fact which legally arises from the circumstances which surround the case. To the law the answer will be complete and satisfactory; to history it will be mere inference of the existence of a fact without any absolute proof of it from cotemporaneous sources. The case must be solved upon the doctrine of presumptions.

While it must be conceded under the decision in 7 *Cranch* that the act of 1758 could not be repealed at the will of the legislature, that act must be regarded as mere evidence of the compact entered into between the state and the Indians.

The moment we cease to look at that enactment as a law binding upon the community until it is repealed, and regard this transaction with the Indians in its true light, as purely a matter of contract evidenced by legislation, the difficulty in the case vanishes.

The act of the legislature is simply proof that the state made such a contract, as the covenant of an individual is evidence of his bargain. The existence of the former on the statute book unrepealed is of no greater force against the state than the existence of the latter with the seals unobliterated is against the citizen.

The defences which could be successfully pleaded in the one case must be applicable to the other.

The contract of the state, when proved, must have all the incidents of, and be dealt with, as any other contract.

It stands upon no higher plane, and is subject to be abrogated, rescinded, or its benefits lost to the party seeking to enforce it, according to the rules which apply in other cases.

The only difference lies in the method of establishing the execution of the contract on the part of the sovereign.

The legislative act must be regarded as mere authority for and evidence of the engagement on the part of the supreme power, and the contract made by virtue of it cannot be held superior to any of the presumptions which would extinguish an obligation between individuals.

From this obligation the state attempted to release itself by the repealing act of 1804. Although the contract could not be receded from in this way, yet the fact that, after this act was declared to be void, the tax was again levied in 1814, and that the relators or their grantors, with full knowledge of their rights, paid the imposition, and have uninterruptedly continued to pay it annually since that time, without questioning the right to lay it, raises a conclusive presumption that by some convention with the state the right to exemption was surrendered.

I know of no obligation between individuals which could survive under such circumstances after this lapse of time.

While there is no statute of limitations which will apply to the case, the presumption will arise, from the payment of the tax for so long a period, that the claim of the citizen has been discharged and extinguished.

Previous to 3 and 4 *Wm. IV.*, *c.* 2, § 3, the courts had, by analogy to the statute of limitations, established the artificial presumption that where payment of a bond or other specialty was not demanded for twenty years, payment or release ought to be presumed.

The recognition for over sixty years of the right of the public and the duty of the citizen will bar the claim of the relators.

Under the English cases a presumption will sometimes arise to establish a claim even against the sovereign, notwithstanding the maxim, " *Nullum tempus occurrit regi.*"

Where the adverse claim could have had a legal commencement, juries are instructed to presume such commencement after many years of uninterrupted enjoyment.

In *Roe* v. *Ireland*, 11 *East* 280, Lord Ellenborough held that the enfranchisement of a copyhold might, upon proper evidence, be presumed even against the crown, in order to support a long enjoyment.

In *O'Neill* v. *Allen*, 9 *Ir. Com. L.* 132, the court said that it was well-established law that in favor of a long possession of a several fishery a jury will be justified in presuming a grant or patent from the crown, or even an act of parliament.

The principle is well stated in *Little* v. *Wingfield*, 11 *Ir. Com. L.* 63 : " When a person is shown for a series of years to have been in the undisputed enjoyment of property, or of any of its rights, incidents or immunities, exercising the rights of property and performing its duties, as it is not easy to believe that a person would thus be left by the true owner, long and freely to enjoy what was not his own, a jury will be allowed to presume a grant, a surrender, a release, or even a grant from the crown, if necessary, as the most natural mode of accounting for the state of things which is found to exist."

This doctrine of presumption against the crown, where the adverse claim could have had a legal inception, is recognized in many cases. *Goodtitle* v. *Baldwin*, 11 *East* 488 ; *Mayor* v. *Horner*, *Cowp.* 102 ; *Doe* v. *Wilson*, 10 *Moo. P. C.* 502 ; *Attorney-General* v. *Ewelme Hospital*, 17 *Beav.* 366 ; 1 *Taylor on Evidence* 130, 131, 132.

So under the English cases, the long enjoyment of port duties, customary dues, fees, or the like, will, if the nature of the case admits of it, be held to warrant the presumption of any fact necessary to make them legal.

In *Rex* v. *Carpenter*, 2 *Shower* 47, evidence of constant payment and an ancient table of duties was held sufficient ground to presume a grant of water bailiff duties on coals to the city of London.

Tolls of a reasonable amount may be claimed by grant or by prescription. *Drake* v. *Wiglesworth*, *Willes* 654 ; *Gard* v. *Calland*, 6 *M. & S.* 69.

The development and growth of this doctrine of presumptions is commented upon by Cockburn, C. J., in *Bryant* v.

*Foot*, *L. R.*, 2 *Q. B.* 161, where he says, " that when the doc-trine of presumptions had proceeded far towards its develop-ment, the legislature at length interfered, and in respect of real property and of certain specified easements, fixed cer-tain periods of possession or enjoyment as establishing pre-sumptive rights. But with regard to all prescriptions or cus-toms not provided for by statutory enactment, the law re-mains as before." See also *Mills* v. *Mayor*, *L. R.*, 2 *C. P.* 476 ; *Mayor* v. *Warren*, 5 *Q. B.* 773, 801.

The rule that a legal liability to pay a duty may be in-ferred from long acquiescence in its exaction is well founded in principle, and there is no reason why it is not applicable in its full force between the state and its citizens, where the bur-den sought to be imposed is common to all.

In this case the obligation of the owners of this title to pay the duty would arise under the law to which all are amenable, as soon as the contract, under which alone exemp-tion could be claimed, was out of the way. That the con-tract could have been rescinded with their assent will be ad-mitted, and in no way can the condition of things which has existed uninterruptedly for two generations be accounted for, except upon the presumption that such assent was procured. Their long-continued submission to the annual exactions of the state must be regarded as a repeated declaration on their part that they are subject to the common burdens.

There are considerations which might well have induced them to enter into a compact by which their right to exemp-tion was surrendered. Their lands have been enhanced in value by the disbursement of the public funds in making and maintaining roads and building bridges ; they have had the advantage of public schools supported by taxation, and have participated in all the benefits of good government. From these sources they derived a pecuniary advantage presumably equal to the amount which they contributed to the support of government.

A persistent refusal on their part to bear their just share of the public burdens might have led the state to exert the

power which it undoubtedly had to set them apart in a township by themselves, where the contributions of others would not have been appropriated to their support.

That they did surrender all claim to immunity under their contract must be inferred under the circumstances presented by this case.

I do not intend to concede that the prosecutors have shown a legal devolution of title from the Indians to themselves. They would be held to the strictest proof in sustaining such an exemption.

In my opinion, the assessments should be affirmed, with costs.